# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

| | | |
|---|---|---|
| CARMINE GREENE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 3:09CV510-PPS |
| | ) | |
| KENNETH R. WILL, et al., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| WESTFIELD INSURANCE COMPANY, | ) | |
| | ) | |
| Garnishee Defendant. | ) | |

## OPINION AND ORDER

As can be seen from the above cause number, this case has some whiskers on it. The case itself was filed more than ten years ago, has been back and forth to the Seventh Circuit, been fiercely fought on some occasions and not at all on others. The underlying facts that led to the dispute go all the way back to the year 2000. That was the year when VIM Recycling, LLC started operating a waste recycling facility in Elkhart, Indiana. [DE 307 at ¶1.] It ran the business on property owned by KC Industries, LLC. [DE 307 at ¶¶1, 2.] Kenneth R. Will was the president and owner of both VIM and KC. [DE 307 at ¶3.] As in previous opinions, I will refer to these three defendants collectively as the VIM Defendants. VIM ran the facility until July 15, 2011, and it proved to be a bad neighbor. VIM was a nuisance both in the legal and colloquial sense, and its behavior led to a huge judgment being issued against it.

The judgment against the VIM Defendants came about when a group of nearby homeowners decided that they had had enough of VIM's polluting behavior and brought this class action to recover damages for environmental violations, nuisance and negligence based on the impact of the waste facility on their homes and property. The case ended in a default judgment against VIM Recycling and K.C. Industries for $50,568,750.00, plus an award of $273,339.85 in attorney's fees against all three VIM Defendants.

Unfortunately, the VIM Defendants are judgment-proof, or so it seems. So the Class turned to the VIM Defendants' liability insurer, Westfield Insurance Company, in these proceedings supplemental, hoping to collect on their monumental judgment as covered under any or all of four annual commercial general liability insurance policies effective from January 1, 2004 through January 1, 2008. The matter is again before me on another motion for summary judgment, this time from Westfield, seeking a determination as a matter of law that no coverage lies. Although at one time they were mortal enemies, the Class and the VIM Defendants are now aligned. In opposing summary judgment, the Class has obtained an affidavit from its former nemesis, Mr. Will. They have joined forces because both have an interest in having Westfield bear the cost of the VIM Defendants' tortious conduct.

## Undisputed Facts

The parties have complied with my instructions on the presentation of allegedly undisputed facts. [DE 300 at 1.] The result is a document of 72 pages, enumerating 272

facts asserted by Westfield and containing the Class's response to each. As I incorporate undisputed facts, I will cite to the paragraph number in the Class's response, where cites to supporting evidence of record are set out. There are three lawsuits that are important to the issue before the court. First, there is this case which I will refer to as either the "Federal Action" or simply "this case." Second, there was a state case which I will refer to as the "State Action." And third, there was another federal lawsuit in this district, a declaratory judgment action before Judge Van Bokkelen, on whether Westfield had a duty to defend and indemnify the VIM Defendants in the State Action. For clarity's sake, I will refer to that case as the "Judge Van Bokkelen" case.

The Policies' CGL Coverage Form contained "Duties In The Event of Occurrence, Offense, Claim or Suit." [DE 307 at ¶262.] These include that the insured "must see to it that we are notified as soon as practicable of an 'occurrence' or an offense which may result in a claim." [*Id*.] The notice should include, to the extent possible, the "[h]ow, when and where" of the occurrence or offense, the names and addresses of injured persons and witnesses, and the nature and location of any injury or damage. [*Id*.] Prompt written notice to Westfield of any claim or suit "as soon as practicable" is expressly required. [*Id*.]

This case was filed against the VIM Defendants on October 27, 2009. [DE 307 at ¶180.] Will did not direct the VIM Defendants' insurance agent, 1st Source, to notify any insurance carriers regarding this case when it was filed. [DE 307 at ¶181.] Instead, the

VIM Defendants retained Plews Shadley Racher & Braun LLP ("Plews Shadley") to represent them. [DE 307 at ¶182.] Plews Shadley filed a motion to dismiss based on various abstention grounds, and on April 21, 2010, I dismissed the Federal Action for lack of subject matter jurisdiction over the Neighbor Plaintiffs' claims brought under RCRA. [DE 307 at ¶184.] I declined to exercise supplemental jurisdiction over the remaining state law claims. [DE 38 at 18.] The Neighbor Plaintiffs appealed the dismissal of the Federal Action to the Seventh Circuit Court of Appeals. [DE 307 at ¶185.]

While this case was pending in the Seventh Circuit, on May 24, 2010 the Neighbor Plaintiffs initiated a second, nearly identical lawsuit in Elkhart County Superior Court, captioned "*Jerry Adkins, et al., Plaintiffs, v. Kenneth R. Will, et al., Defendants*, Cause No. 20D01-1005-CT-00038, Elkhart Superior Court No. 1." [DE 307 at ¶186.] Once again, the VIM Defendants did not direct 1st Source to notify any insurance carriers regarding the State Action at the time it was filed. [DE 307 at ¶187.] The VIM Defendants initially retained Robert Sanders of Sanders Pianowski LLP to represent them in the State Action. [DE 307 at ¶188.] In or about October 2010, Will learned that Mr. Sanders had a conflict of interest that would prevent him from representing the VIM Defendants in the State Action, and therefore, in consultation with Amy Romig of Plews Shadley, Will instructed its insurance broker, 1st Source, to notify certain insurance carriers for the VIM Defendants regarding the existence of the State Action and seek coverage for the State Action. [DE 307 at ¶189.]

On October 1, 2010, Lisa Cromwell, a Westfield Claims Specialist, received a "General Liability Notice of Occurrence/Claim" from 1st Source, notifying Westfield that the VIM Defendants had been sued in *the State Action* and that the VIM Defendants sought coverage for the State Action under the Policies. [DE 307 at ¶190.] Upon learning of the State Action, Ms. Cromwell contacted Bruce Clark, Esq. of Bruce P. Clark & Associates to serve as Westfield's assigned defense counsel for the VIM Defendants in connection with the State Action, pending an investigation of coverage. [DE 307 at ¶192.] I am emphasizing that notice was given of the State Action because conspicuous by its absence was any notice of the Federal Action which at that point was still pending appeal.

On or about October 14, 2010, Stephen St. Clair, a Westfield Litigation Specialist, learned of the State Action and was asked to handle the coverage investigation for Westfield. [DE 307 at ¶193.] St. Clair contacted Mark Smith, Esq. of Smith Fisher Maas & Howard, P.C. to serve as Westfield's outside coverage counsel in connection with the investigation into coverage for the State Action. [DE 307 at ¶194.] On October 14, 2010, Smith informed St. Clair that the Neighbor Plaintiffs had previously sued the VIM Defendants in the Federal Action but that the suit had been dismissed for lack of subject matter jurisdiction and was on appeal to the Seventh Circuit Court of Appeals. [DE 307 at ¶195.] This information from attorney Smith on October 14, 2010 was the first time anyone at Westfield became aware of the existence of the Federal Action. [DE 307 at ¶198.]

Westfield took immediate action related to the State Action. It did an investigation related to coverage and thereafter, as Westfield's coverage counsel, Smith sent a letter to Will on behalf of the VIM Defendants on February 4, 2011: (i) notifying Will that Westfield had completed its coverage investigation; (ii) informing him that Westfield had concluded that it had no duty under the Policies to defend or indemnify the VIM Defendants in the State Action; and (iii) reserving all of its rights under the Policies. [DE 307 at ¶211.]

Westfield then sought a declaratory judgment against the VIM Defendants and the neighbor class. The case, Cause No. 3:11CV159 filed in this court on April 18, 2011, was assigned to Judge Joseph Van Bokkelen. In its complaint, Westfield noted the pendency of the State Action as well as the pending appeal of the Federal Action, but the relief sought was a declaration that Westfield had no duty to defend or indemnify the VIM Defendants in the State Action. Defaults were entered against the three VIM Defendants on July 18, 2011 and the declaratory judgment Westfield wanted against the VIM Defendants was granted by default on September 1, 2011. [3:11CV159, DE 18, 19, 20, 27, 28, 29.] As for the neighbors, they entered into a Stipulation with Westfield, so ordered by Judge Van Bokkelen, that Westfield had no duty to defend or indemnify the VIM Defendants against the State Action. [*Id*. at DE 30, 31.] The Stipulation was based on Westfield's allegation that the VIM Defendants did not timely provide Westfield "with notice of the [State] Lawsuit or the extensive history of the environmental issues outlined therein." [DE 30 at 8; DE 31 at 8.]

Meantime, on appeal, the VIM Defendants were represented by Ms. Romig of the Plews Shadley law firm. On May 3, 2011, the Seventh Circuit reversed and remanded this case, and it was reinstated to my docket. *See Adkins v. VIM Recycling*, 644 F.3d 483 (7th Cir. 2011). Mysteriously, at no time, from the filing of the Federal Action through its appeal and reinstatement by the Seventh Circuit or thereafter, did Will or 1st Source ever seek or request coverage from Westfield for the Federal Action. [DE 307 at ¶236.]

### The Default Judgment

After the remand, the Class amended the complaint to add defendant Soil Solutions Company, which had purchased the assets of VIM in July 2011 and was alleged to be the successor in interest with respect to the facility's continuing operations. [DE 66 at ¶13.] Counsel for the VIM Defendants was permitted to withdraw in December 2011. [DE 105.] Defendant Will advised the court in February 2012 that he intended to represent himself, but a default was entered against him in January 2013 for his failure to plead or otherwise defend against the amended complaint. [DE 113, 162.] Default was entered against VIM Recycling and KC Industries in March 2012, after their counsel had withdrawn and they failed to obtain new representation to defend them against the amended complaint. [DE 120, 125, 126.]

The Class was certified in April 2013. [DE 176.] After Soil Solutions of Elkhart LLC was added as a defendant in a second amended complaint [DE 152], the Class settled their claims against the Soil Solutions defendants, and their proposed settlement

was approved and a consent decree issued in June 2014. [DE 207.] Under the consent decree, Soil Solutions agreed to wind down the operations of the wood-waste processing facility, to place a restrictive covenant on the property prohibiting solid waste management operations on the site, and not to sell or lease the site to any entity engaged in a list of prohibited types of operations. [DE 207 at 5-7.] Finally, the claims against the VIM Defendants were disposed of by the default judgment imposing joint and several liability on VIM Recycling and K.C. Industries in the total amount of $50,568,750.00, and awarding the Class litigation costs of $273,339.85 against all three VIM Defendants, jointly and severally. [DE 228.]

## Procedural History of Proceedings Supplemental

The Class initiated these proceedings supplemental against Westfield within a few months after the entry of the default judgment. [DE 235.] Westfield met the matter with a motion for summary judgment arguing that the disposition of Judge Van Bokkelen's case had res judicata impact here barring the Class's claims for coverage of the judgment in this case. [DE 256, 259.] I denied the motion because Westfield's complaint and Judge Van Bokkelen's Agreed Judgment expressly addressed only a defense and indemnification for the State Action. [DE 270 at 8, 12.]

Next came a motion by the Class for partial summary judgment, in which they argued that Westfield had breached its duty to defend the VIM Defendants in this case, and as a result was equitably estopped from asserting policy defenses against the Class's claim for indemnification. [DE 273, 274.] That motion was also denied, largely

8

because the record did not then disclose sufficient information about when and how Westfield received notice of this litigation against its insured to determine when (if at all) a duty to defend was triggered. [DE 288 at 10.] I also noted my reluctance to resolve the proceeding "on less than a full exploration of all the facts and legal arguments relative to Westfield's liability under the policies." [*Id*. at 13.] The third "omnibus" summary judgment now before me [DE 301], filed after the close of discovery in these proceedings, represents that full factual record and broad scope of argument.

### Discussion

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party opposing summary judgment may not rely on allegations or denials in her own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). Summary judgment "is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008).

Westfield's motion raises six separate arguments in support of its contention that there is no coverage under the Westfield policies for the default judgment and award of attorney's fees against the VIM Defendants. In summary, here are the six

arguments: (1) there is no coverage because the VIM Defendants breached the policies'

requirements to provide Westfield notice of the Federal Action; (2) there is no coverage

because the conduct at issue was not accidental; (3) there is no coverage because the

damage arose from professional errors and omissions; (4) there is no coverage because

the policy excludes damages for expected or intended injury; (5) there is no coverage

because this was a "known claim" at the time the policies were purchased; and (6) there

is no coverage because there is a pollution exclusion in the policies of insurance.

Some of the arguments have no merit and need not be discussed. But because I

find that Westfield is correct on arguments (1), (4) and (5) noted above, summary

judgment will be granted in favor of Westfield and against the Class.

### <u>Insured's Compliance with Notice Requirement</u>

In an earlier opinion, I noted that:

> The Class has not adduced evidence of how and when Westfield first
> learned of this federal action, and whether and when its insureds, the
> VIM defendants, ever tendered this action to Westfield for a defense.
> And the Class's argument fails to address the legal significance, or
> insignificance, of those facts (whatever they are).

[DE 288 at 10.]  The summary judgment record before me now fills in those gaps of

evidence and argument.  Westfield's first argument is that the complete failure of its

insureds to notify Westfield of this Federal Action breached the notice provision of the

liability policies, caused prejudice to Westfield, and relieved the insurer of any coverage

obligation.  [DE 302 at 4.]  Plaintiffs respond that:

> Westfield's policies do not contain a requirement that its insured tender
> the defense of any lawsuit to it, nor is any such tender requirement

> imposed by Indiana law.  Instead, cases hold that a policy's notice requirement is met and an insurer's duty to defend is triggered when the insurer receives--from any source--the "foundational" information designated in the policy's notice provision.

[DE 304 at 2.]

First, I'll recap the relevant facts. When first sued in this Federal Action in October 2009, the VIM Defendants hired their own counsel, who remained in the case until after its trip to the Court of Appeals and back.  [DE 105.]  After the remand of the action to this court in May 2011, the VIM Defendants took no action to notify Westfield of the pendency of the case.  Even after their retained counsel withdrew in December 2011 [DE 105], the Clerk entered defaults in March 2012 [DE 126] and January 2013 [DE 162], and default judgment was sought in March 2015 [DE 214], for reasons that are entirely unclear, the VIM Defendants did not turn to Westfield for a defense.  When Westfield finally learned of the Federal Action on October 14, 2010, it was not from the VIM Defendants, but from an attorney whom Westfield had contacted to serve as outside coverage counsel in connection with the investigation into coverage for the State Action.  [DE 307 at ¶195.]

Now to the governing law.  "In Indiana, the notice requirement of an insurance policy is 'material, and of the essence of the contract.'"  *Wolf Lake Terminals, Inc. v. Mutual Marine Ins. Co.*, 433 F.Supp.2d 933, 950 (N.D.Ind. 2005), quoting *Miller v. Dilts*, 463 N.E.2d 257, 265 (Ind. 1984). "Without notice, the insurance company has no liability to the insured."  *Id.*, citing *PSI Energy, Inc. v. The Home Insurance Company*, 801 N.E.2d

705, 715-16 (Ind.Ct.App. 2004). Although for breach of a liability policy's cooperation clause, the insurer must show actual prejudice to avoid liability, the burdens are different for a breach of the notice provision. *Miller*, 463 N.E.2d at 265. The insured's duty to notify is a "condition precedent[] to the insurance company's liability to its insured." *Id*. at 260-61. Prejudice is "presumed by an unreasonable delay in notifying the company about the accident or about the filing of the lawsuit." *Id*. at 265. If prejudice is presumed based on a *belated* notice from the insured, the presumption is all the more appropriate where the insureds *never* provide notice to the insurer, as is the case here. *See Republic-Franklin Ins. Co. v. Silcox*, 92 F.3d 602, 605 (7th Cir. 1996)(where insured herself never notified insurance company of the accident, "there can be no question whether [she] breached the duty to notify").

In *Republic-Franklin Ins. Co.*, the Seventh Circuit recapped and affirmed the approach of *Miller*, observing that for the insured to overcome the presumption that arises from failure to timely notify the insurer, it "must offer evidence showing that the insurer suffered no prejudice." *Id*. at 604. "Without any such evidence, courts will presume prejudice as a matter of law," and the insurer is not required to provide coverage because the insured has failed to satisfy a condition precedent to coverage. *Id. See also Miller*, 463 N.E.2d. at 261. In 2009 and 2010, the Indiana Supreme Court expressly affirmed the holding of *Miller* as to a rebuttable presumption of prejudice arising from the insured's late notice. *Tri-Etch, Inc. v. Cincinnati Ins. Co.*, 909 N.E.2d 997, 1005 (Ind. 2009); *Sheehan Construction Co., Inc. v. Continental Casualty Co.*, 938 N.E.2d

12

685, 689 (Ind. 2010). Thirty years after *Miller*, this court affirmed that these principles continued in force under Indiana law. *Bowman, Heintz, Boscia & Vician, P.C. v. Valiant Ins. Co.*, 35 F.Supp.3d 1015, 1024-25 (N.D.Ind. Aug. 1, 2014).

Realizing what it's up against, the Class attempts a lame argument that "Westfield's policies do not contain a requirement that its insured tender the defense of any lawsuit to it, nor is any such tender requirement imposed by Indiana law." [DE 304 at 2.] But the argument is scuttled by the Class's failure to dispute that the policies expressly imposed duties of notice to Westfield in the event of an occurrence, offense, claim or suit, and that fulfillment of the duty was a "condition[] to coverage." [DE 307 at ¶262.]

Because the Class can't argue that the VIM Defendants provided timely notice, the Class next argues that the information Westfield received on October 14, 2010, when the Federal Action was on appeal, was sufficient notice to trigger a duty to defend *as of that point in time*. [DE 304 at 2.] That principle would eviscerate the concept of *prompt* notice, and the Class cites no authority that supports it. In any event, Westfield cites cases in support of its response that this sort of second-hand information does not satisfy the VIM Defendants' obligation to provide notice of the action to its insurers. For example, in *Republic-Franklin Ins. Co.*, the Seventh Circuit twice notes that where the insured herself never notified her insurer, there could be no question that the insured breached the duty to notify, even though the insurance company eventually learned of the claim from the tort victim. 92 F.3d at 605.

Oddly, on the issue of notice via third-party, both sides cite *Frankenmuth Mutual Ins. Co. v. Williams by Stevens*, 645 N.E.2d 605 (Ind. 1995). As I have previously held [DE 288 at 9], the facts of *Frankenmuth* are distinguishable from this case, in which there are no circumstances equivalent to Frankenmuth's prior knowledge and investigation of the tort and issuance of a reservation of rights letter preceding its awareness of the civil action in which it received discovery requests. More significantly, *Frankenmuth* is not on point legally. The legal analysis in *Frankenmuth* is about collateral estoppel binding the insurer to facts determined by the insured's consent to judgment, occurring after the insurer elects not to defend. *Id*. at 608. The analysis does not address the coverage impact of the insured's failure to comply with notice requirements, or even whether the insurer had breached a duty to defend. *Id*. at 607. *Frankemuth* has no implications for the issue before me now in this case.

I readily find that as the underlying insureds, the VIM Defendants breached their duty to provide Westfield prompt notice of the Federal Action. Under Indiana law, this creates a rebuttable presumption of prejudice to the insurance company. In addition, Westfield argues that it was in fact prejudiced by the lack of notice from the VIM Defendants. Westfield points out, by way of contrast, that after the VIM Defendants formally tendered a claim for coverage against the State Action, Westfield took various steps that it was unable to take here in the Federal Action. These included "assigning counsel to defend under reservation of rights pending an investigation, declining coverage upon the conclusion of that investigation, and seeking a declaratory

14

judgment that Westfield did not owe defense or indemnity." [DE 302 at 9.] Given that the VIM Defendants acted to seek a defense and coverage for the State Action but not the Federal Action, Westfield contends that it "was left to conclude, correctly, that the VIM Defendants were not seeking coverage for [this] lawsuit." [*Id.*]

In addition, the Indiana Court of Appeals has found that an insured that failed to give timely notice to its insurer further compounded the prejudice by voluntarily undertaking the defense of the action against it, which violated the "insurer's right to promptly investigate a claim or to control the defense of a lawsuit with which it might be subjected to liability[.]" *Paint Shuttle, Inc. v. Continental Casualty Co.*, 733 N.E.2d 513, 520-21 (Ind.Ct.App. 2000). The same is true here. The second-hand notice of a Federal Action that had been pending for a year, had gone through preliminary injunction proceedings, a motion to dismiss, and a reversal on appeal was clearly not in time to permit Westfield to promptly take all the steps in defense of the action that it would have wanted to take. The fact that Westfield now defends itself against a default judgment of more than $50 million demonstrates the potential for prejudice compared to the actions it took with the State Action to defend under reservation of rights and then successfully seek a declaratory judgment of no coverage.

The Class makes no attempt to offer evidence, or anything more than an unsupported conclusion, that Westfield suffered no prejudice from the failure of its insureds to provide notice as required under the policies. [DE 304 at 10.] The position is plainly insufficient in light of both Indiana law and the facts of the case. As the

Indiana Court of Appeals has held, when an insured made "a strategic decision to attempt to obtain a dismissal of the lawsuit on its own accord without eliciting [the insurer] for assistance," and only turned to the insurer for a defense after the effort failed, the insured had breached the notice provision of policy and failed to allow the insurer "to exercise its right to investigate or defend the claim." *Paint Shuttle, Inc.*, 733 N.E.2d at 521. Furthermore, when Westfield finally learned of the Federal Action, the news was not from its insureds, and *what* Westfield learned suggested that the VIM Defendants sought no defense or coverage from Westfield, given that they had hired counsel on their own and never contacted Westfield about the Federal Action.

As a matter of law, for the failure of its insureds to give Westfield timely notice of the Federal Action, I conclude that Westfield owed no duties of defense or indemnification of the VIM Defendants in this case. Neither can Westfield be held liable in these proceedings supplemental for the whopping default judgment entered against the VIM Defendants.

Even though these conclusions are dispositive of the case, I have gone on to consider Westfield's arguments as to particular defenses under the liability policies that preclude coverage for the judgment in this case. The determination that Westfield did not receive notice sufficient to trigger its duty to defend also defeats any contention that, by breaching the duty to defend, Westfield is equitably estopped from asserting policy defenses, an argument I rejected when I denied the Class's motion for partial summary judgment last April. [DE 288 at 7-11.] In any event, the Class makes only a

weak and unpersuasive argument on the issue, citing no Indiana law in support. [DE 304 at 11-13.]

Some of the same undisputed facts are relevant to the two additional exclusions that support summary judgment for Westfield. The exception for expected or intended injury focuses on an insured engaging in certain conduct even when he knows that harm is almost certain to result. The known claim exclusion applies to property damage that began prior to the policy period if the insured was aware of it. In this case, each of these defenses requires consideration of what the VIM Defendants knew, and when, about the harms the Class complained of in this action.

## Expected-Intended Injury Exclusions

There is another reason why Westfield must prevail on the coverage question. Both the CGL Coverage Form and Umbrella Coverage Form expressly disclaim coverage for property damage "expected or intended from the standpoint of the insured." [DE 307 at ¶259, 267.] Under Indiana law, this language is considered an "exception" rather than an "exclusion," and the insured bears the burden of proving that the property damage was neither expected nor intended. *PSI Energy, Inc. v. Home Ins. Co.*, 801 N.E.2d 705, 727 (Ind.Ct.App. 2004). The "expected" prong is the one at issue here, and it applies when the insured "acted even though he was consciously aware that harm was practically certain to occur from his actions." *Sans v. Monticello Ins. Co.*, 676 N.E.2d 1099, 1102 (Ind.Ct.App. 1997), quoted in *PSI Energy*, 801 N.E.2d at

728. This "practically certain" standard is higher than merely "should have anticipated" or a reckless disregard for safety. *Id.*

The undisputed facts support the policy exception for intended injury, by demonstrating VIM's continued operations despite awareness of resulting property damage complaints, without any mitigating response. The VIM Defendants agreed to a Fugitive Dust Control Plan in July 2000, which was intended to "control fugitive particulate matter emissions from the outdoor grinding and screening of 'recently live' wood." [DE 302-3 at 255.] Agreed Orders entered into by IDEM and Will on behalf of the VIM Defendants evidence the insureds' awareness of their fugitive dust violations and handling of solid waste in a manner that created a threat to human health or the environment, and a pollution hazard. [DE 302-4 at 20 (July 14, 2001), 59 (April 12, 2004); DE 302-6 at 13 (Dec. 14, 2006), 20 (Jan. 4. 2007).] These orders demonstrate that the VIM Defendants were consciously aware that those types of environmental harm had occurred and were practically certain to continue to occur from their operations of the facility during the time period of their CGL policies with Westfield.

The Class does not dispute that after multiple inspections in August 2003, the VIM Defendants received an enforcement letter from IDEM dated October 8, 2003, documenting observed violations of the facility's Fugitive Dust Control Plan, VIM's operating permit and Indiana environmental rules. [DE 307 at ¶34.] During an IDEM site inspection in January 2004, VIM's Vice President was told that "numerous residents had complained regarding fugitive dust in recent months." [DE 307 at ¶47.] Also

undisputed is that on January 22, 2004, an IDEM agent spoke with defendant Will to discuss the fugitive dust problem and the VIM Defendant's plans for an indoor grinding operation and dust collection system.  [*Id*. at ¶52.]

After site inspections in April 2004, Will told the IDEM agent that he had met with neighbors to discuss fugitive dust concerns.  [*Id*. at ¶70.]  On July 29, 2004, IDEM emailed photos of the dust cloud generated at the Elkhart facility to VIM's Vice President.  [*Id*. at ¶81.]  Will's affidavit relied on by the Class admits that, prior to 2007, Will was told by representatives of IDEM "that persons had complained to IDEM that they were bothered by dust, smoke, noise, or odors that were allegedly coming from the Site."  [DE 308-1 at ¶6(e).]  On this record, the undisputed facts support the conclusion that the VIM Defendants were consciously aware that the kind of environmental harms alleged in the Class's complaint, and on which the default judgment is based, were practically certain to result from their operation of the Elkhart facility over the period of coverage under the CGL policies.

Speaking of the complaint, the Class cannot now disclaim its own factual allegations, which were deemed admitted by the VIM Defendants' default.  Those allegations establish that the VIM Defendants continued the Elkhart facility's operations despite their awareness of the injuries those operations were inflicting on their neighbors' use and enjoyment of their properties. For instance, the Class alleged in its second amended complaint that:

On countless occasions Plaintiffs and other Class members attended public hearings and meetings, signed petitions, and submitted oral and written complaints to their local, state and federal regulatory agencies, political representatives, the media, and Defendants, about health, safety, fire, noise, odors, aesthetic, rodent/vector, and pollution problems from Defendants' outside dumping, handling and processing of waste materials at the Site. Nevertheless, Defendants callously continue their harmful activities and turn a deaf ear and blind eye to the neighbors' complaints of offensive smoke, dust and odors caused by the Defendants' operations.

[DE 152 at ¶4.] Also alleged and admitted is that IDEM inspected the Elkhart facility in August 2005 in response to neighbors' complaints, and IDEM determined that the outdoor storage of waste was a threat to human health or the environment, and created a fire hazard, vector attraction, air or water pollution or other contamination. [*Id.* at ¶19.] Despite IDEM's findings and directive to cease storing any additional "C grade" material at the site, defendant Will ignored the directive and by January 2006 had dumped nearly 50% more waste on the pile. [*Id.*]

This voluminous record of undisputed facts is sufficient to establish that the VIM Defendants knew of the neighbors complaints that damage was occurring. For the plaintiff Class to now argue that the VIM Defendants didn't know their polluting conduct was affecting anyone when the Class complained for years and caused VIM to incur dozens of environmental violations is unpersuasive. [DE 312 at 16.] The exception for injury expected from the VIM Defendants' standpoint precludes coverage for the judgment in the underlying case, because given the history of the Elkhart facility's

operation, the VIM Defendants were consciously aware that harm was practically certain to occur but continued operations in the same way.

### Known Claim Exclusion

There is a final basis for summary judgment in favor of Westfield. Coverage is unavailable for a "known claim." What this means is that an insured can't cause a loss then go get the insurance for it. To allow this would turn the insurance business on its head. What rational insurance company would cover a claim after it already occurred? To protect against this, insurance companies include a "known claim" exclusion in insurance polices to make sure that they are not covering a risk that has already materialized.

The policies in this case are no different: coverage under the CGL policies applies to property damage only if it "occurs during the policy period" and "[p]rior to the policy period, no insured...knew that the...'property damage' had occurred, in whole or in part." [DE 307 at ¶257.] In other words, where the insured had that prior knowledge, any "continuation, change or resumption" of the property damage during the policy period is "deemed to have been known prior to the policy period." [*Id.*] The same language appears in the policies' Umbrella Coverage Form. [*Id*. at ¶266.] The policies define the insured's knowledge to include the earliest time at which the insured, or any employee authorized to give or receive notice of an occurrence or claim, becomes aware by any means that property damage has occurred or has begun to occur. [DE 257-1 at 27.] "Property damage" is defined to include not only "[p]hysical injury to

tangible property," but also "[l]oss of use of tangible property that is not physically injured." [DE 257-1 at 41.] This type of exclusion expresses the common law "fortuity" or "known loss" principle, "that one may not obtain coverage for a loss that has already taken place." *Indiana Ins. Co. v. Kopetsky*, 14 N.E.3d 850, 852 (Ind.Ct.App. 2014).

The series of four liability policies with Westfield began in January 2004. The question, therefore, is whether the undisputed evidence shows VIM's awareness of property damage from its operations prior to 2004? It most certainly does. The evidence of this knowledge starts in July of 2000, when the VIM Defendants agreed to the Fugitive Dust Control Plan. [DE 302-3 at 255.] On September 29, 2000, IDEM made a field inspection of the Elkhart facility prompted by complaints of fugitive dust from outdoor grinding operations visible in the air crossing a county road adjacent to the facility. [DE 302-3 at 265.] Based on the inspection, IDEM concluded that the VIM defendants were grinding scrap lumber outside in violation of the Fugitive Dust Control Plan and not watering sufficiently to prevent visible emissions of fugitive dust. [*Id.*] These findings were communicated to defendant Will by telephone on September 29, 2000 and by certified mail dated November 13, 2000. [*Id.* at 265, 271.] An Agreed Order signed by Will on July 14, 2001 reiterated these findings. [DE 302-4 at 21.]

An IDEM field inspection was prompted in April 2003 when a neighbor complained of fine dust believed to emanate from the Elkhart facility that was accumulated on the neighbor's pond and on his cars. [DE 302-4 at 39.] No evidence of fugitive dust was visible at the time of the surveillance inspection. [*Id.*] Based on

another neighbor's complaint of dust settling on his car, IDEM field inspections were conducted on August 22 and 28 in 2003. [DE 302-4 at 41.] The inspection report reflects that on August 22 "large puffs of dust were seen being generated periodically just north of the main building...but was not seen crossing property boundaries." [*Id.*] Apparently from a different source at the VIM facility that day, a significant dust plume "was observed crossing the south property boundary onto the neighboring property." [*Id.* at 47.] In the context of compliance with the Fugitive Dust Control Plan, the IDEM inspector noted in his report that "[t]he potential for fugitive dust exists everywhere on VIM's property." [*Id.*] Violations of the Plan observed during the August site visits were noted in IDEM's October 8, 2003 letter to defendant Will, sent by certified mail, and in the Agreed Order signed by Will on April 12, 2004. [*Id.* at 50, 59.]

There's more. A neighbor's complaint of fugitive dust in October 2003 prompted an IDEM field inspection on November 5, 2003. [*Id.* at 65.] During the surveillance, visible dust was observed being generated, but not seen crossing VIM's property boundaries. [*Id.*] IDEM's report reflects that the complainant had spoken with VIM representatives who told him they were working to solve the dust problems. [*Id.*] Other neighbors of the Elkhart facility contacted IDEM on November 7 and December 10, 2003. [*Id.* at 67, 69.] IDEM responded that dust violations had already been documented and "that IDEM is aware of the fugitive dust problem." [*Id.* at 69.] The Class does not dispute that during an April 21, 2004 phone call with IDEM concerning improvements to the facility's dust collection system, defendant Will "said that he has

met with neighbors on occasion to discuss fugitive dust concerns." [DE 302-6 at 29; DE 307 at ¶70.]

The Class relies on Will's June 25, 2018 affidavit, which includes his attestation that "[a]t no time prior to January 1, 2007 was [he] aware that 'bodily injury' or 'property damage' within the meaning of the Westfield Policies…had occurred in whole or in part as a result of the operations or other conduct of VIM or K.C. or conditions at the Site." [DE 308-1 at ¶5.] The repeated use of quotations marks around "property damage" within Will's affidavit signifies that he uses the expression as a term of art limited to the policy definition. But it is Will's (or VIM's) awareness of a condition that ultimately supports a claim for property damage that matters, not their knowledge or belief that the condition actually constitutes "property damage" as defined in the policies. Given that the question is VIM's knowledge *prior to* obtaining the insurance, the policies' definition cannot reasonably be the applicable standard for determining VIM's awareness of property damage.

There is another problem with Will's affidavit. Its use of legal terms and conclusions runs afoul of Fed.R.Civ.P. 56(c)(4)'s requirement that an affidavit used to oppose a motion "set out facts that would be admissible in evidence." Legal arguments and legal conclusions in summary judgment affidavits are not recitations of fact and can be disregarded. *Paniaguas v. Aldon Companies, Inc.*, 2006 WL 2568210, at *5 (N.D.Ind. Sept. 5, 2006) (and cases cited therein).

This analysis is further supported by the Indiana Court of Appeals' decision in *5200 Keystone Limited Realty, LLC v. Netherlands Insurance Comp.*, 29 N.E.3d 156 (Ind.Ct.App. 2015). In that case, CGL coverage for environmental remediation was barred by Indiana's common law "known loss" doctrine because the insured was aware of contamination on the property before purchasing the real estate and obtaining the CGL policy. *Id*. at 163. In opposition to the insurer's motion for summary judgment, the insured relied on an affidavit attesting that the insured did not believe, and had no reason to believe, that it would ever be held responsible for the contamination. *Id*. at 163. The court found that such an affidavit was "insufficient to create a genuine issue of material fact regarding application of the known loss doctrine" when it conflicted with undisputed evidence demonstrating the insured's awareness of the contamination. *Id*. at 163, 164. *See also Crawfordsville Square, LLC v. Monroe Guaranty Insurance Company*, 906 N.E.2d 934, 939 (Ind.Ct.App. 2009) (applying a long-standing rule against the use of an affidavit to defeat summary judgment where it conflicts with sworn deposition testimony of the affiant without a plausible explanation for the discrepancy).

On the undisputed facts, I conclude as a matter of law that defendant Will, and therefore the VIM Defendants, had become aware, prior to January 2004, that property damage resulting from fugitive dust had occurred or begun to occur. This is an additional alternative basis on which Westfield is entitled to summary judgment in the Class's proceedings supplemental. In making this determination, I do not rely on a number of sources the Class contends are not properly considered, including allegations

25

of the second amended complaint deemed admitted by the VIM Defendants' default, post-2004 IDEM activity not relevant to the VIM Defendants' pre-2004 knowledge, the report of Westfield's expert witness John Mundell, or class members' interrogatory answers (the substance of which the Class now disputes – DE 307 at ¶¶56, 57).

**Pollution Exclusion**

There is also a pollution exclusion in the policy that is worth discussing, although I am not relying on it in my disposition of the case. The CGL policies contain a pollution exclusion applicable to property damage "which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants' at any time." [DE 307 at ¶¶260, 261.] "Pollutants" are defined as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste," and "[w]aste includes materials to be recycled, reconditioned or reclaimed." [*Id*.] The policies also contain a notice of "Indiana Changes – Pollution Exclusion" that includes this language: "This Pollution Exclusion applies even if such irritant or contaminant has any function in your business, operations, premises, site or location." [*Id*.]

Westfield acknowledges that "Indiana courts construe pollution exclusions narrowly," but still contends that the record here – including the Class's own allegations and environmental expert – support the application of the pollution exclusions. In 2012, the Indiana Supreme Court addressed a liability policy with the same definition of "pollutants" as is present in the Westfield policies, and noted that it

had "interpreted this or similar language on no fewer than three occasions, reaching the same result each time." *State Auto Mut. Ins. Co. v. Flexdar Inc.*, 964 N.E.2d 845, 847, 848 (Ind. 2012). Each time the Indiana Supreme Court found the language to be ambiguous and construed it against the insurer. *Id*. Beginning in *American States Insurance Co. v. Kiger*, 662 N.E.2d 945 (Ind. 1996), the court said that the definition of pollutants "[c]learly...cannot be read literally as it would negate virtually all coverage." *Id*. at 948. The court held that the failure of the definition to expressly include the particular substance at issue in the case required that the clause be construed in favor of the insured. *Id*. at 949. Noting that in more recent years the insurance company had used a revised pollution exclusion, the Supreme Court in *Flexdar* observed that the more detailed "Indiana Changes" endorsement in later policies "resolve[d] any question of ambiguity." *Id*. at 852.

Despite the weight of this unfavorable precedent, Westfield relies on *West Bend Mut. Ins. Co. v. U.S. Fidelity and Guar. Co.*, 598 F.3d 918 (7th Cir. 2010), in which the Seventh Circuit, applying Indiana law, affirmed summary judgment in favor of an insurer, finding that the pollution exclusion applied against claims that the insured's gas station contaminated groundwater in a residential neighborhood. In addition to the same "pollutants" language as appears in the VIM Defendants' policies, the policy in *West Bend* contained language expressly excluding claims arising from the seepage of "motor fuels." *Id*. at 921. The court held that the policy in *West Bend* succeeded in specifically disclaiming coverage for motor fuels: "The plain language of the contract

thus explains that Federated will not cover property damage or personal injuries related to gasoline. This conclusion is buttressed by the fact that the Indiana Changes Endorsement applies the Pollution Exclusion 'whether or not such irritant or contaminant has any function in [the insured's] business, operations, premises, site or location.'" *Id.* at 923.

*West Bend* did not contradict the conclusion of the Indiana Supreme Court in *Kiger* and *Flexdar* that their common definition of pollutants was ambiguous. Instead, the Seventh Circuit could find in favor of the insurance company because the policy in that case contained additional language explicitly excluding coverage for discharge of motor fuels. *Id.* at 923. Westfield argues that there is no dispute that the damage suffered by the Class resulted from smoke, fumes, chemicals and waste, all of which are expressly referenced in the policies' definition of pollutants. [DE 302 at 33.] While that is true, it is unclear to me whether the line of Indiana cases addressing this definition of pollutants requires the conclusion that the exclusion is generally unenforceable because it is ambiguous, even in the event of damage from one of its specified terms.

A number of cases contain language that might support that conclusion. *See Atlantic Casualty Ins. Co. v. Garcia*, 227 F.Supp.3d 990, 995 (N.D.Ind. 2017); *Old Republic Ins. Co. v. Gary/Chicago International Airport Authority*, 2016 WL 3971663, *4 (N.D.Ind. July 26, 2016); *Flexdar*, 964 N.E.2d at 849 n.2; *State Auto. Ins. Co. v. DMY Realty Co., LLP*, 977 N.E.2d 411, 422 (Ind.Ct.App. 2012); *Travelers Indem. Co. v. Summit Corp. of America*, 715 N.E.2d 926, 935 (Ind.Ct.App. 1999). In the context of this case, a determination that

the definition of pollutants renders the exclusion unenforceable might also be bolstered by the inherent ambiguity of the terms "waste," "chemicals," and "fumes." In any event, the scope of the pollution exclusion has been "an evolving area of the law, subject to differing interpretations." *Freidline v. Shelby Ins. Co.*, 774 N.E.2d 37, 42 (Ind. 2002). Given that uncertainty, and because I have otherwise found three separate bases on which to grant Westfield's motion for summary judgment, I decline to undertake any further analysis of the applicability of the pollution exclusion on the facts of this case.

## Conclusion

By these Proceedings Supplemental to Execution, the Plaintiff Class as judgment creditors seek to recover the default judgment [DE 228] and award of attorney's fees and costs [DE 227] under Commercial Insurance Coverage Policies No. CMM 3447047 effective 1/1/2004, 1/1/2005, 1/1/2006, and 1/1/2007, issued by Garnishee Defendant Westfield to the VIM Defendants. On the record of undisputed facts presented on this third motion for summary judgment, I conclude that Westfield is entitled to judgment as a matter of law. Westfield has no duty to indemnify its insureds because: (1) the insureds failed to timely notify Westfield of the legal action; (2) coverage is barred by the policies' exclusions for expected injury; and (3) coverage is barred by the known claims exclusion. Westfield's motion for summary judgment will be granted, and the Clerk will be directed to enter judgment in Westfield's favor. The dispositive analysis does not require a resolution of either Westfield's motion to strike the affidavit of

Defendant Will or the Class's motion to exclude the report and testimony of Westfield's expert witness. Those motions will be denied without prejudice.

**ACCORDINGLY:**

Garnishee Defendant Westfield Insurance Company's motion for summary judgment [DE 301] is GRANTED.

Plaintiffs' Motion in Limine to Exclude the Report and Testimony of Westfield Insurance Company's Expert Witness, John A. Mundell [DE 305] is DENIED WITHOUT PREJUDICE.

Garnishee Defendant Westfield Insurance Company's Motion to Strike the June 25, 2018 Affidavit of Kenneth R. Will [DE 310] is DENIED WITHOUT PREJUDICE.

The Clerk shall enter judgment in favor of Garnishee Defendant Westfield Insurance Company and against the Plaintiff Class on its Proceedings Supplemental to Execution [DE 235].

**SO ORDERED**.

ENTERED: June 3, 2019.

   /s/ Philip P. Simon
**PHILIP P. SIMON, JUDGE**